May I first ask the court's indulgence? A week ago I... Can we get your name for the record, please? My name is Larry Popovsky, counsel for Massimo. A week ago I sprung a leak in the eye of a detached retina, had an operation, and lo and behold, I had insult to injury. They used oximetry material that was manufactured by your adversary. Is this a medical practice case? No. That was not exactly a surprise because Tyco is, in fact, a monopolist. Although they don't dwell on it in their briefs, they do not contest the finding of the jury that they are a monopolist. And that's a given. There also can be no issue in this case that the rule of reason applies across the board as to all claims. The case went to the jury under rule of reason instructions. The instructions were the subject of stipulation. There was no claim here as there was in Peace Health. The instructions were error. And under those instructions, the jury was entitled to weigh, among other things, the various justifications for the practices that Tyco offered. And they, of course, were found wanting. And that was a disputed factual record. So if that is where we are procedurally in the trial court in terms of the jury deliberations, the question becomes what's the issue we want to review? And the issue has to be a substantial evidence review. The argument, although, again, these words don't appear in the other side's brief, they are, in fact, arguing there is no substantial evidence to support the jury's verdicts, all three. And I'll come to the bundling later. Now, I must confess, I find that a ‑‑ by the way, I'd like to reserve five minutes. I find that a relatively heroic argument to make on this record, which is immense. The evidence shows a complex set, not just of price lists and buying and selling, but of contracts, actual contracts which were mandated for issuance, entry, by members of the various GPOs, particularly Premier, and I'll come back to that. Those contracts covered 70 percent at least of the total market and, using the language of the Supreme Court in Tampa Electric, they had the practical effect of foreclosing the small entrant, Massimo, which entered the market with superior technology. Well, do I understand correctly the judge found that even if some of the bundling can be shown to be any competitive, you weren't able to prove what part was and what part wasn't? I accept the fact that the judge seemed confused by the record on bundling, but, in fact, the bundling contracts are in the record, and for whatever reason Judge Felser did not appreciate, they were expressly admitted into evidence both for Premier and for Novation. They covered the products that are identified in those bundling contracts and they also specifically required 95 percent compliance with them. Ninety-five percent of the demand of the... If you bought, if you signed a bundling contract, you had to purchase 95 percent of your goods from Taipa. Can you point to me some evidence as to the different causation of damages by the market share discount contracts and the bundling contracts? One of the issues on appeal is what we believe to be Judge Felser's error on the damages because she took the view that because bundling was an additional practice, together with sole source and exclusive and market share discounts, that they were always entered into, or almost always, by a given hospital conjunctively, and you couldn't separate out why a particular hospital chose to buy when they did, that you therefore disregard the legality entirely of sole source and exclusive dealing. And that surely, in our view, on the damage side... Just to make myself clear, let me try again. Surely. Can you distinguish the causation of damages to Massimo, claimed by you, on the one hand from the two types of conduct, sole source and market discount contracts? Put those to one side. And bundling, can you point to me some evidence that you presented? Not as a separate, if I may, Your Honor, not as a separate item of damage. The bundling was a form of piling on. There were additional... I understand your argument. So the answer is no. The answer is no. You cannot separate out... All right. So therefore, if we affirm the finding by Judge Felser that bundling damages are not compensable because bundling is legal under the circumstances under the health care case, a peace health case, then you can't point to damages caused by the first two contracts and damages caused by bundling. All of the damages which we claimed were caused by a combination of the two illegal practices. Plus bundling. Bundling was an additional practice which coexisted and added additional discounts on the same contracts. But the way in which the damage model worked, Mr. Odover, the professor who was the plaintiff's, the defendant's expert, divided the hospitals between those who were affected and those that were not. And by affected, he meant affected by the illegal contracts, the sole source and the exclusive dealing. All of those hospitals were also affected by bundling to the extent that they participated in bundling. Now, if bundling were legal, it was no different than any other legal term in the contract. If bundling was illegal, it didn't add specifically to the damage amount. So in that sense, it was unimportant in the calculation of damages. Nonetheless, bundling I think we should focus on for a moment just to make sure we're clear. Peace health is the source of the issue on bundling, of course. But why would peace health be the source of the bundling issue? First of all, as I understand it, you proceeded on the LePage's theory, the Third Circuit case. In the trial, it was, the inspection was based on LePage. In the trial here, they were based on LePage's. And that's where we are. We're not trying this case over again. We're at the trial level, and then the judge did a judgment on a matter of law. But we're still at the trial stage. Now we're not trying the case over again here under peace health. That's correct. Okay. So what difference does it make whether we have peace health or not? In the trial, you could have selected any theory you wanted to try this case on. You selected to try it under the LePage's theory. The answer to the question is one took the laws, one found it. At the time of the trial, peace health was not yet decided. LePage has laid out a smorgasbord of all kinds of law. It did. And trust that you could have picked. But you picked the LePage's theory because of the issue relative to costs relative to the bundling theory. And you tried it on that basis, unless I'm wrong. No, the party stipulated that the proper rule of law to go to the jury was a LePage's-based instruction. They're going to stipulate it's your case. That's correct. Okay, so it's your case. You proceeded on that. We then moved for a new trial based on the fact that peace health had come down and demonstrated that as a matter of law, bundling had to be assessed a different way. It was laying there. You could have been peace health. This case could have been peace health. You could have argued that theory. You elected not to. It was precisely argued before peace health came down on the new trial and NOV motions by Massimo. Did you prove tying or predatory pricing or cost? No. There was no attempt to prove either of those, nor was there any need to. So how could the jury find for you on those theories then? The jury did not find for us on predatory pricing. Because they weren't instructed. On predatory pricing, no. Okay. There was no claim made. The core claim made was that the phalanx of contracts, the sole source, the market share, and the bundling, all were species of exclusive dealings. And as such, they are subject to the classic foreclosure test, which in modern parlance comes from Tampa Electric. That is the precise analysis that was employed in Microsoft, the precise analysis that was employed in Densley. It is similar to the analysis that was done in sports health. I read your brief. How about the Brooke case, the Supreme Court Brooke case? Brooke case is a predatory pricing. But let me make this clear. There are two basic kinds of antitrust defense on monopoly maintenance. The first is pricing. Have you priced in such a way to offend Section 2? And that is Brooke rule. The rule for straight price cases, for its straight price competition, is in order for a monopoly maintenance case to be sustained, there must be sales below cost. And if there's bundling, there must be an attributed cost analysis. That's the PeaceHealth edition. On the other hand, there is a very powerful, strong, traditional view of monopoly maintenance, which says that foreclosure analysis, which has nothing to do with cost, that foreclosure analysis applies when the practical effects of the practices are contractual exclusions. And that's this case. Let's stop just a second. You've asked to go back and retry this case under the PeaceHealth theory. Is that correct? What we have said is that if bundling, if bundling is not viewed as we urge it to be viewed as a form, because there's actual contracts here for bundling. This is not like LePage's. It's not like PeaceHealth. But if it's not viewed as exclusive dealing. You're just arguing the evidence that the jury went through. I mean, and the district judge went through all the evidence. And we've gone through the evidence. So we can argue about what the facts are. But I'm talking about the theory of law. You want to retry your case on a new theory of law that we've now enunciated in the Ninth Circuit under PeaceHealth. We made the record below that the proper test, as we move from new trial, that the proper test was an attribution test. Judge Felser, when she took the verdict away from the jury, set it aside, she said bundling does not raise an antitrust issue at all. That is clearly wrong. We said it was wrong at all times. Now, what was the right test. She didn't exactly say that. She said some bundling can be legal, it can be illegal. In order for it to be illegal, you have to prove. She said two things. Pricing or tying or something like that. Yes, but not as anything else. It either fell into those categories or there was no antitrust issue at all. Bundling is not illegal. Right. But bundling can be illegal as an exclusive deal. Bundling can be illegal as a price offense. Let me see if I've even got a handle on this case. Exclusive dealing is LePage's all over and over again. And I think that's what you proved. No, if I may, with respect, Your Honor, I actually argued LePage's and I actually argued PeaceHealth. Yes. There were no exclusive contracts in LePage's. There were no exclusive contracts except for the one year which the price which was not before the Ninth Circuit. There were no exclusive contracts in PeaceHealth. No. It was treated by the Ninth Circuit as a straight price competition case in PeaceHealth. LePage's was straight price except in LePage's they said the effect of this price practice could be seen as an exclusive deal. We don't have to go there. We don't come near that. We have actual contracts. Yeah, but you're just labeling the actual contracts as exclusive contracts. Because the evidence shows, if I may, take Premier. Whose evidence shows that? Let me take Premier. Your evidence shows that. Absolutely. Was there other evidence before the jury? None that disputed the fact that, for example, for Premier, you were obligated to sign a 95 percent, pardon me, a 90 percent market share contract, which prohibited you, if you were a hospital, from even asking for bids from competitors. But you won on that, right? We didn't win on that. We absolutely did. And we should have more damages than we got. We have our damage arguments. And we should have had an injunction as well. But what I'm saying is the exclusive, we won on that, but they claim it was there. And so I have to address it, given the procedure. But the short and the long of it is that these contracts, although not airtight, not 100 percent, these contracts foreclosed as a practical matter. For example, and this is the decisive kind of proof of the pudding, when under the threat of litigation, Massimo was added to the Premier and Ovation contracts. And they became not sole source, but dual source GPOs. Massimo's sales went up dramatically. Prices dropped. Massimo had been consistently trying to price under Tyco and had been unable to pierce the wall of the contracts. All one really needs to do is look at the statements of Tyco's business executives. Let's stop right there. The jury did all that and ruled for you. The district court then went and reviewed these facts again that you're arguing to us and came to a different conclusion. You're asking us to do the same thing now, to go back and look at these facts and come to the conclusion that the jury came to. That's all you're asking. No, I'm not. I'm asking you to engage in a substantial evidence review, which is what the other side asks. That they claim there is no substantial evidence to support the jury verdicts. That is, it seems to me, inconsistent with the expert opinion, with the statements of their own employees, with the record which has been assembled of these contracts. Now, bundling is a separate issue, to be sure. It stands in a separate footing. But we made our record below that we ought to have had an opportunity to try the bundling case, whatever its impact on damages, because it could affect an injunction. Speaking of the jury verdict, they come back with an answer to a question that says damages were incurred prior to July 2001. Right. And Judge Felser winds up giving you damages that occurred after July 2001. On motion for new trial. I don't know how to describe that. No.  But when she then held the new trial without a jury, she decided that that probably couldn't be sustained, and she de facto modified her own ruling on the new trial motion under which she was operating. Well, that's a factual finding of the jury, right? Pardon? That's a factual finding. Yes, and we moved to set it aside, because it was plainly contrary to all the evidence. There was no evidence that damages stopped in July 2001. None whatsoever. I didn't read her order to say I don't find this finding to be factually supported. I had the impression she was trying to somehow rationalize it to fit the finding. Did I misread her order? I don't see where she said this finding has no support. It's out like she did the other things. I think if one looks at the record, the finding that damages stopped in July of 2001 is simply indefensible. Well, then it goes to the fact that the monitors may have stopped. You stopped looking at monitors as of that date, but the monitor that was in place caused damages because the sensors carried over. That was what she ultimately held. But her decision to keep the 2001 date, it seems to me, itself was wrong. To cut off where the monitors were. Yeah. That was wrong, because the sole source contracts for premier regulations... Did you try this case? 2002 and 2003. Did you try this case? No, I did not. All right. But wasn't there an admission by counsel for Massimo that the damages were between 1998 and 2001? No, there was not. In argument? There was not. We have put into our brief with very great care the words which she found, at least to her mind, constituted a form of admission and observed that just a few sentences before, he had mentioned that the damages, in fact, were throughout the time period involved. And he talked about the events in 2002 and 2003. And that was put on a damage case which showed most of the damages after 2001. Your claim is that she took that out of context. Yes, absolutely out of context. And for an admission by a lawyer and final argument to be binding, that is a tough law, if I may put it that way. Now, I'm running out of time. I did want to have a little bit of rebuttal. We'll give you five minutes on rebuttal. Thank you, Your Honor. I hope you'll identify and rebuttal why we should take your damages as evidence rather than the Tyco evidence which the court took. On the amount of damages. On the amount of damages, yes. You can speak to that now if you wish or wait until you come back. I'm sorry, Your Honor? If you'd like, you can address that now or wait until you come back. Well, I can do it right now. Let me give you an example of Chicago. Millions and millions of dollars turned on Cook County and how it was classified in Professor Ordover's methodology as either affected or not affected. At trial, liability, he had it as unaffected. But for damage purposes, he classified as affected. So the effect of this was multi-millions of dollars. What was at issue was a contract which expired by its terms after two years. And at the end of the two years, there had to be a bidding, open bidding, because it was a public hospital in Cook County. And in that open bidding in 2000, our client, Massimo, outbid Tyco, which I think puts paid to the claim that we were unwilling to price low. Massimo got the contract. Now, somehow in the damages calculation, it was argued by the other side that as a matter of reading the judge's opinion, that contract was a form of requirements contract which should have been classified as affected. And therefore, in the classification, in the damage trial, he moved it. When you say affected, affected by the exclusionary contracts. By the contractual practices which were found to be illegal. But it's impossible in my view for it to have been in the same category with the GPO contracts for the simple reason that it was a public agency that had to have public bidding. The monitors were given away free. There was no lock-in. There was no way Chicago was locked up. And at the end of the two years, it was open bidding, open bidding. And yet, because of the way in which it was presented, millions of dollars were lost in the damage calculation. And that's one of the four errors on damages. What's our standard of review? Now, the district judge had a separate trial on damages. You each had your own experts and testimony. What's our standard of review to determine how we should look at how she looked at your evidence versus. There being no issue of fact in what I just stated. It's plain error. It's plain error. Plain error. Okay. And I think that's. We reviewed de novo what the district judge did. Yes. Okay. Thank you very much. Thank you. Mr. Olsen. Thank you, Your Honor. Theodore Olsen on behalf of the defendant, Pellenton Crossapellin. Appellee and Crossapellin. This is a price discount case. The United States Supreme Court said as early, as recently as a year and a half ago, that price cutting is the very conduct that the antitrust laws are designed to protect. At no time, there are three or four facts and three or four legal decisions from this court that are compelling and dispositive, we submit, in the context of the fact that this is a price cutting case. At first, at no time, were Tyco's discounted prices below cost. Under all three programs, taken individually or in the aggregate, its prices were substantially above costs. The Massimo expert said, I have no evidence of predatory pricing. The maximum discount, at the maximum discount, Tyco was marketing a product for $9, that it cost them $2.12 to produce. That's at page 20 of the first Tyco brief. Secondly, no Tyco contract or arrangement precluded any hospital from purchasing any product from any supplier at any time. If it chose to do so, it was a matter of price. All the Tyco contracts in this case, in addition, were terminable without cause on short notice. Those are very, very important factual considerations. As Mr. Popofsky says, the contracts are before the court. Third, the sole source and bundling arrangements were initiatives of the GPOs, the contracting agency for the hospitals. It is admitted. In fact, it's stated affirmatively in the Massimo second brief on pages three and four. Those contracts offer significant administrative and transactional savings and important efficiencies to hospitals. Therefore, they are pro-competitive. The Novation contract was put out competitively for bidding. Massimo bid on it. It didn't receive the benefit of that contract because it was put out for competitive bid and that portion of it was given to Tyco. That contract was executed in January of 2001, only a few months before the damage cutoff, which I'm sure we'll get to. Mr. Olson, you said that the No Tyco contract precluded purchase of product from others, as my note indicates, but the market discount contracts were not volume discount prices. They were percentages of hospital or GPO purchases. So they said, if you want to get the discount prices from us, you cannot buy from others. When you have monopoly power, isn't that a practical exclusion? What the Supreme Court has said repeatedly is that above-cost discounts, and this is a discount and it's an above-cost discount, are not anti-competitive. Now, it's voluntary. The hospital may choose to purchase from Massimo at a certain price or it may choose to purchase from Tyco at a certain price. If the hospitals had Tyco monitors, which lasted in a useful life of five to seven years, and prior to 2001's introduction of the Radical by Massimo, the monitors accepted only Tyco sensors, then they had to buy a certain amount of Tyco sensors to furnish their Tyco monitors, didn't they? They couldn't just buy 100 percent from Massimo because they'd be buying a Chevrolet wheel for a Ford car. Judge Baird, there's evidence in the record, it's at pages 22 and 23 of the second, I believe it's the second Tyco brief, where it is cited that the monitors could have been replaced easily and at no cost. Now, I acknowledge that that changed over time because of the changing technology that was occurring all of the time in this case, but the answer to your question is that in many cases, hospitals did buy different sensors and could buy different types of monitors throughout this period. The fact is, I think the fundamental fact is that if a hospital was going to have to buy monitors from Tyco anyway, the fact that it was getting them at a discount is pro-competitive as long as those discounts are above cost. Not talking about monitors, sensors. Did you misspoke? Sensors, I did misspeak. Thank you. Let's say, furthermore, I wanted to talk for a moment or two about the two different contracts. It is important to look at those contracts. The Novation contract didn't come into existence until 2001 for only a short period of this case, so the statistics about market foreclosure, which are based upon the existence of that contract, are quite misleading because we're talking about a small period. The bundling part in the Novation context didn't come until April of 2001, just a month or two or a couple of months before the damage cutoff. The Novation contract, the sole source contract, contained 12 different products, only three of which were Tyco products. Nine were produced by Abbott, Kodak, other manufacturers of products. Even in those bundling contracts where non-Tyco products were offered at lower prices, a portion of the bundling contract required that the buyer supply or purchase a certain percentage of its needs, not volume discounts, but needs, or else it wouldn't get that discount or any other discount. Well, I think you're referring to the market share discounts as opposed to the bundling discounts. Yes, but the market share discounts were part of the bundling contracts. Well, there was interrelationship there, but I think if you look at that contract, Your Honor, which again was only in existence for a short period of time, that you could comply with the requirements to get the discount without buying oximetry products. By the way, the trial judge concluded that the Novation contract was not anti-competitive, and that's an issue that wasn't appealed. It's not before this court. So it shouldn't be a part of the calculus at all. The Premier contract was one of those things where you had various different levels of discount. It was plus four, plus three, plus two. You could buy certain products, and if you bought all of them, including the oximetry products, you would get the maximum level of discount. But if you didn't meet the levels with respect to the oximetry products, you would still get a discount, and you didn't have to buy those oximetry products under that contract. Mr. Olson, this is an extremely complex case. I've found that when reading your briefs and now listening to your argument and your proposing counsel's argument, I find that let's talk about market share and sole source. The district judge found that a reasonable jury could have come up with liability after hearing all your evidence. We're now re-arguing the case before us. What standard should I look at? Let's stay with the market share and the sole source. What standard should I look at when I'm looking at the district's court decision when she found a reasonable jury heard your evidence, heard both sides here, and we've heard both sides right now? How do we look at it? You look at it de novo with respect to whether a course of conduct or a course of dealing violates the antitrust law. What if we find that the jury had some hard decisions to make and there was evidence on both sides? Well, with respect to whether or not that course of conduct, irrespective of what the jury decided, yes, the jury made certain decisions which the judge found were incorrect in the first place. But with respect to various different things. With respect to bundling, but respect to the sole source and the market share, she did not touch that verdict by the jury. Well, but whether or not the sole source contracts were exclusive dealing would be a question of law. The contracts are before the court. It's the same issue. But that means we'd have to look at the contract and review all the evidence and all the testimony to come up with. You wouldn't have to. You can look at the contract and the indisputed evidence that the contracts itself were not exclusive dealing contracts. They gave opportunities. The contracts were between the GPOs, the sole source contracts, were between the GPOs and TYCO. But whether they're exclusive dealing contracts deals not only with the language of the contract, but also whether when there is monopoly power, there's a practical effect of making the contracts exclusive. It's not simply a matter of interpreting the language as if we were textualists or originalists sitting next to Justice Scalia. But we have to take a look at the contracts and the evidence under which they operated to determine whether there was substantial foreclosure in the market due to the monopoly power of TYCO added to the contract language. Well, there are two or three answers to that, if I may, Judge Bea. First of all, the process that you would have to go through is exactly the same process that you went through in Western Parcel and in the Omega case and in the Peace Health case. The types of contracts are not identical by any means or differences, but the collective similarity between whether or not contracts are exclusive when they gave the hospitals the opportunity to deal through their GPO, whether or not they should deal with the GPO, whether they would join that GPO or some other GPO, whether or not Massimo had an opportunity. Massimo was operating at a substantial 59% margin, which it didn't cut until when it did cut. Then it managed to do better with respect to the GPOs. So it wanted to keep its margin. It wanted to deal without a selling force, Salesforce, until 2001. A lot of decisions that were in here, and they're in the record, and they're indisputable. So part of the answer, Judge Bea, is that it's the same process that the court went through in Western Parcel, Omega, and Peace Health. The fact is that in this case, the hospitals had a choice of various different ways, dealing with different GPOs or changing the GPOs or not going off contracts, so to speak, which many hospitals did. They had the contractual right to do that. Under this court's decisions in Western Parcel and Omega, that means that those contracts were not exclusive dealing contracts, and you don't need to go through all of the record and sift all the evidence, which the jury did, in order to come to that conclusion. What you have, as I said, is a discounting case. The undisputed evidence, Nassimo was not able to establish under any set of circumstances that prices were below cost. So you have a situation where the ultimate consumers had choices, but the choices were related to cost. Now, the Supreme Court, as was mentioned, especially starting in the Brook case, but five times since then, says that above-cost pricing is not anti-competitive if it's pro-competitive. And the other thing that underlies a great deal of what we're talking about here is that the antitrust laws are intended to give people a guidance with respect to how to conduct their conduct. If a practice is pro-competitive, it's very important not to lay down a rule under the antitrust laws that would constrain competitors and drive people away from processes whereby prices are reduced. So what you're saying is that regardless how exclusionary a contract would be, regardless of Section 14 of the Clayton Act, if the pricing that results from an exclusionary contract is indeed above cost, that's the end of the inquiry. Well, it is in the context here. There may be other contexts, Judge Beyer, that I want to say the same thing. I have the same concern, and it may be that my further review is going to have to dig into this a lot more. If LePage's was the theory of the plaintiff's case, do you think that was the theory of the plaintiff's case and how the jury was instructed? And what does cost have to do with anything as far as their case is concerned? They've made a choice. That's what the questions indicated. Exactly. And so if cost is out of the question and you're saying you sold above cost and, therefore, the jury couldn't have found for us, but they tried it on a different theory. So what do you think? Where did the jury go wrong? They had all kinds of choices with respect to how to try the case. And the antitrust laws are constantly changing. You have to put your case, as you suggested in your questions, you have to put your case on the way you can. But even their experts said the prices weren't predatory. So I'm not saying – I don't think the jury went wrong with respect to that. It came to a different conclusion based upon a lot of argument about monopolies and so forth. Bear in mind that it is not against the antitrust laws to try to become a monopoly if you don't use anti-competitive practices to do so. Every entrant into the market hopes that their product will be so good, their process will be so efficient, and their price is sufficiently attractive that they will become the only factor in the marketplace. There was a lot of evidence in this case about salesmen saying that we're going to drive the other guys out of business. There is in almost every antitrust case because people participating in the marketplace and the sales force and so forth use hyperbolic language in this court and other courts have held over and over again that that's not the standard by which the court comes to a conclusion about the violation of antitrust laws, foreclosure of the market, or anti-competitive practices. I wanted to go to Mr. Popofsky's point about a rule of reason. The rule of reason with respect to all of these contracts and with respect to the whole situation that was prevalent here included the following, I submit, undisputed facts. The contracts were on their face, terminable. The contracts between Tyco and the GPOs were terminable on short notice. Shorter notice than was involved in the situation that the court was dealing with in the Omega case and in the Western Parcel case. They were terminable without cause on 90 or 180 days notice. Those were the contracts that Tyco was a party to. Well, the judge found that the jury could have found that, in fact, they couldn't be terminated as a practical matter on short notice. They could be. She said that the jury could have found. The jury could have found because they were sufficiently attractive. But, you know, ultimately the fact is that they were. One of them was terminated in 2002. One of them was terminated in 2003 when Tyco brought its costs down and decided to have a sales force. But that was, I was just talking about one aspect of the rule of reason inquiry. A second aspect of the rule of reason inquiry is that are these contracts pro-competitive? Is the course of conduct pro-competitive? First place under the law established by this court and other courts. They were sought by the GPOs because they wanted efficiency. They wanted to aggregate their purchasing power so that they could get lower prices. As I said, the Novation contract itself was put out for competitive bidding. The hospitals received advantages from the volume purchases and the volume arrangements that were produced by the GPOs. So Judge Felser said a jury could have found that these hospitals felt locked in because of the way, the incompatibility of the censors to the monitors. So even if she would have disagreed with it, she says the jury could have found that. I think that when we're talking about a rule of reason, I think in the first place during part of that period was, according to the evidence, the monitors could have been changed. And there were other factors involved in that as well. But it's only one aspect of the rule of reason inquiry. Okay. But if you flunk that one, there's reasonable doubt. I don't think we flunked it at all. I think the evidence is much more supportive of the fact that Massimo wanted to keep its prices high and therefore affected the ability, this so-called installed base issue that you're referring to, that they could have changed the monitors without reducing in a relatively easy fashion. Is that the only way to look at it or is that just you're looking at it in the light most favorable to you? She found the jury could have looked at it the other way. I understand that. And rather than go back and forth with respect to it, let me just refer the court again to that page 22 and 23 where it's specifically discussed. Since we're running out of time, let me ask you another question. Change gears for a second. I'm concerned about what looks like the discrepancy between the verdict and the post-July 2001 damage award. It looks like the district judge is struggling to reconcile those. I understood Mr. Papofsky to say she was in effect rejecting the finding, but I'm not sure how I would read it. Can I make several points with respect to that cutoff date? Number one, it was important to Massimo to have the jury make that decision. It requested, I think it was finding 14 or inquiry number 14 that was given to the jury because of a patent case, and this was discussed in the briefs, that it was important to them to have the damages cut off at July 1, 2001 because of a set-off in connection with a patent case. So if they got more money here, they would have to set off a verdict in the patent case. Yes, yes. That's as I understand it, Judge Bea. And the record discusses this pretty thoroughly. They say that we suffered all of our harm. You asked about that question in the closing argument. We suffered all of our harm before July 1, 2001. They also said that our world changed in July 2001 because we put in a sales force. They insisted on, it was a matter of tactics for them to have this cutoff. Twice, Judge Felser said, are you sure you want to do this because I'm not sure that the jury can actually make a decision based upon that kind of time cutoff? And twice, counsel for Massimo said, oh yes, I'm sure that they can, and of course the jury did. They made that determination. There was certainly evidence to support it because Massimo itself said that the evidence did support it. No, no, I got that. I guess what I'm asking you is she then takes this verdict and tries to rationalize damages after July 2001. She offers an explanation for how she did that. I wonder if you would comment on whether she was within her authority to try to reconcile these two things. I think that she was not within her authority to do that. As a matter of law, there was substantial evidence to support the decision that she had, at the request of Massimo's counsel, had put to the jury. The jury had made its decision. There was substantial evidence to support it. She says I'm giving it a degree of deference. It's not like she's saying I'm throwing it out the window. She says I'm giving it deference. I don't think she was giving it deference. I think what she was doing was rejecting what the jury found. She says she's giving it deference. She used that word. She says that, but I think that it's clearly not giving it deference when she has decided I'm going to reject it. She came to a different conclusion, and I think with respect to that, as long as there was substantial evidence to support it, that decision should stand. I didn't finish, and I'm indulging. Why don't you take another minute or so, and then we'll hear from you. Thank you. With respect to the rule of reason, just let me wrap that up. The contracts were terminable without cause on short notice. That's on the face of the contracts. They were sought by the GPOs for efficiency, competitive reasons. They're pro-competitive. Massimo was a new entrant into the market whose sales grew 2,000% in four years. It became profitable. It developed a $250 million market value in a relatively short period of time. In the Omega case, the court found that because Schlumberger was a new entry in the market and grew to 6% to 8%, that in and of itself precluded a finding of foreclosure in the market. There were pro-competitive justifications for the small hospitals, these market share contracts. That put smaller hospitals on the same level as a larger hospital if their market share, however small it was, was at the same level. And these forms of arrangements, I'm just using factors that this court and other courts have said must be put into play with respect to the rule of reason. These forms of arrangements, as Pethel's health particularly said, were widely used in the marketplace. And, in fact, Massimo used some of these same techniques or attempted to use some of these same techniques. I'm saying that if we considered those factors, if you argued them here, that the district judge was incorrect on the market share and the sold pricing and the verdict to go the other way because you're saying that the jury, as a matter of fact that you're saying should be considered by us, should have gone the other way. I'm saying it shouldn't have gone to the jury. The JMOL should have been granted. And that's the same thing. That was my next question. It sounds like both counsel are arguing that they should have gotten a JMOL on all issues. And so the jury's kind of been pushed off the side, even though you folks are arguing facts. Well, that same thing happened in the very, very thorough opinion of this court in PeaceHealth. And these same issues were before the court in Western Parcel. How do you deal with footnote 27 in PeaceHealth? It said specifically that it was not applying the rule that is found to exclusion contract case because there was no exclusion in PeaceHealth. And PeaceHealth had primary, secondary, and tertiary. McKenzie only had primary and secondary, right? And they felt. But there was no exclusion. PeaceHealth didn't say you've got to buy all your services from us. You could buy primary and secondary from them. You just would have to get tertiary someplace else. So there's no exclusive contract there. And the court recognized that. Well, but I think that in the context of Western Parcel and Omega, where the court specifically dealt with what was exclusive and what wasn't, and the argument that the competitor was making in the PeaceHealth case is that because they didn't provide those tertiary services, that was an exclusionary situation. But what the court said is that market discount, bundling discounts, and those types of things are not exclusionary practices. They have to be reviewed under whether or not they are predatory and anti-competitive. Those are the standards. Even if it's a monopolist, they have to be reviewed under those standards. And those standards thoughtfully applied, took away a decision by a jury in that case because the course of conduct was not anti-competitive. Let me just see if we have any other questions. Thank you, Mr. Roy. Thank you. Mr. Rapap, you get the last word today. Unfortunately, my last word would take two hours. But I don't think I have that. If I just may return to the question of the admission by counsel, it's addressed in our first brief at page 48, note 13, and in our reply at pages 46 to 47. And that is a complete analysis of that. If I heard my adversary correctly, he advanced what I think is a relatively revolutionary proposition, and that is that if you induce exclusive dealings by getting discounts, whatever that means, I don't know if it's discounts from this, but by an intractable price, then if those prices that induce exclusive dealings are above cost, then you switch to cost analysis, and that's the end of the Inquiry into Brooke Group. That is not the law. That is certainly not the law. What is the law, and what's your basis of that? All exclusive, I will explain if I may, all exclusive dealing cases have prices in the contracts that are attractive to both sides. If you go back to Tampa Electric, there's no discussion of cost, none whatsoever. If you look at Microsoft, there is no discussion of cost. If you look at Densely, there is no discussion of cost. What there is is foreclosure. It's classic foreclosure analysis for exclusive dealing. Now, that's entirely separate, body of law, from that which has become so important in antitrust jurisprudence, which is in price competition, below-cost sales are the name of the game. PeaceHealth was below-cost sales argument. It was an attribution argument. It expressly said in a footnote discussing the tie-in portion of the opinion that we are not addressing exclusive dealing, and that's not surprising because in exclusive dealing, the defendant had won in PeaceHealth, and on appeal, it was not before the court. It was a straight price case. You have these two corpuses of laws, two bodies of law, which Counsel has complained. And he- Is LePage's one of the bodies? I'm sorry? Is LePage's one of the bodies? Your Honor, having lost LePage's, I lament LePage's as a matter of jurisprudence. The Ninth Circuit, certainly in PeaceHealth, declined to follow. But it's still out there as part of the body of law. But it's still part of the body of law. LePage's, I think if I can take refuge in what the Solicitor General said on cert, nobody can figure out what the rule of law LePage's thought it was following when it rendered its opinion. It was sort of an old-time religion, all the great cases of antitrust thrown in, and sort of it's anti-competitive as a result. In LePage's, it was a straight price case. And I must confess, I made precisely the same argument in LePage's, that it should therefore be triggered. It should therefore trigger a cost analysis, only to have it rejected, although not by the dissent. The precise same argument the Ninth Circuit accepted in PeaceHealth. Those are price cases. I would respectfully submit that if your honors were to accept the view that you heard from the tyco today, you would have to disagree expressly with the mode of analysis that was undertaken in Microsoft and invincibly the two most prominent monopoly maintenance cases brought by the United States of America in the last decade. Which is Tampa and Microsoft. Microsoft invincibly. And moreover, you would have to, I think with all respect, disregard the enormous number of statements by tyco executives on the practical effects of what they were doing with their contracts. This record is replete with statements by tyco saying, we are keeping them out, Massimo is everywhere, they're trying to price below us, but our GPO contracts are stopping them. Our market share contracts are stopping them. And they are. And they are contracts. What's wrong with what I thought Mr. Olson was arguing, which is what you thought he was arguing, which is forget about any means or methods that is used by any competitors. So long as the price is cut and it isn't cut below predatory pricing, we don't care about exclusive dealing methods by which that result is reached. What's wrong with that argument? Well, with great respect for my adversary, that is patently wrong. It is patently inconsistent with the entire body of jurisprudence dating back to Tampa Electric. It is entirely inconsistent with the analysis that was done in Microsoft and it simply reads out of the antitrust laws foreclosure analysis. It reads out Section 14 of the Clayton Act, too. I would think so. It would affect a fundamental restructuring. Even an activist restructuring. One last thing on bundling. Wrap it up if you would, sir. Okay. I just wanted to go back to bundling for the moment. In the post-trial proceedings, there's no question the bundling went to the jury on a pages-type analysis. But in the post-trial proceedings, when the motion was made by the other side to set aside the verdict of the jury, the argument was made, well, if you set it aside, you should order a new trial under an attribution test. An attribution test, which, by the way, came down later in Peace Health. And the judge simply took it away from the jury after the fact and did not order that new trial. Right. But the change in the law, it seems to me, was preserved by our clients. We were entitled, therefore, at the very least, if bundling isn't seen as an exclusive deal, we're entitled to a remand on bundling, whatever its effect on damages because it affects the motion. Thank you, Mr. Professor. Thank you. Thank you. Thank you. Hope your eye is better, Mr. Profoskey. We'll stand and recess. Thank you.
judges: Brunetti, Silverman, Bea